## INVENTORY LOAN AND SECURITY AGREEMENT

This Agreement is entered into by and between HYUNDAI MOTOR FINANCE COMPANY ("Lender") having an address at 10550 Talbert Avenue, Fountain Valley, CA 92708 and INCREDIBLE AUTO SALES, LLC. ("Dealer") having an address at 1832 King Avenue West, Billings, MT 59102.

Dealer, in the course of its business, acquires new and used motor vehicles, trucks and chassis ("Vehicles" or singularly "Vehicle") from manufacturers, distributors or other sellers. Dealer has requested Lender, and Lender agrees, to finance Dealer's inventory of Vehicles, subject to the following terms and conditions:

1. **ADVANCES**
   a) Advances hereunder may be made by Lender:
      i) On Dealer's behalf to manufacturers, distributors or other sellers of Vehicles to Dealer;
      ii) Directly to Dealer for the purpose of Dealer's acquisition or holding of Vehicle inventory; or
      iii) On Dealer's behalf to a third party which has previously financed Dealer's Vehicle inventory.
   b) Lender is authorized and requested to deal directly with manufacturers, distributors or other sellers of Vehicles in arranging payment on Dealer's behalf. Lender may rely upon any invoice or advice from any such manufacturer, distributor or other seller as being correct in all respects and Lender is relieved and released from any responsibility or liability for the correctness, validity or authenticity of any invoice or other instrument presented to it for payment or for the existence, quality, condition, identity, value, title or delivery of property purported to be represented by any such invoice or other instrument.
   c) Lender will establish and may from time to time, in its discretion, increase or decrease the total of advances to be made to or on behalf of Dealer and the makes, models, types and age of Vehicles eligible for advances.

2) **INTEREST AND CHARGES**
All advances by Lender pursuant to Section 1 hereof, and all other indebtedness of Dealer to Lender under this Agreement shall bear interest from the date of advance by Lender to the date of payment by Dealer at the annual rate, calculated on the basis of a 365 day year and the actual number of days elapsed, established in the Interest Rate and Charges Addendum in effect between Lender and Dealer. In no event shall the rate of interest exceed the maximum permitted by applicable law, which the parties recognize may change from time to time.

Interest on the total amount owed by Dealer under this Agreement, together with any applicable charges, shall be due and payable monthly within ten (10) calendar days of the date of billing by Lender.

3) **PAYMENT BY DEALER**
Dealer promises to pay Lender all indebtedness created pursuant to this Agreement as follows:

   a) As each Vehicle upon which Lender has made an advance is sold by Dealer, Dealer agrees to remit faithfully and immediately to Lender the amount of the outstanding advance by Lender on such Vehicle; provided, however, that absent an Event of Default, as defined in Section 8 hereof, Dealer shall have the privilege of paying such amount to Lender no later than the earlier of (i) the fifteenth calendar day after the sale or (ii) the second business day after funding of such Vehicle sale. For purposes of this Section 3, the date of sale is defined as the earliest to occur of (a) the date of delivery of the Vehicle to the customer, (b) the contract date, (c) the date the manufacturer's certificate of origin or certificate of title is assigned to Lender, or (d) the date the Dealer is paid for the Vehicle. Dealer acknowledges and agrees that the above privilege is solely for the administrative convenience of Dealer and may be revoked without prior notice at any time if, in the sole judgment of Lender, Dealer has failed to comply with the terms hereof. Notwithstanding anything herein to the contrary Lender will collect the amount of the outstanding advance(s) on any sold Vehicle(s) for which Dealer has received but not yet remitted payment at the time of any audit.

   b) In the event that, in the judgment of Lender, the value of any Vehicle upon which an advance has been made becomes reduced, such as by the introduction of new model year motor vehicles, Lender may, in its discretion, require Dealer to remit all or a portion of the advance on any such Vehicle.

   c) In the event any new Vehicle upon which Lender has made an advance is not sold by Dealer within 365 days of such advance, Lender may, in its discretion, require Dealer, and Dealer promises, to repay immediately such advance upon demand by Lender.

**EXHIBIT 1**

4) **TERMINATION OR SUSPENSION OF ADVANCES**
   Lender may terminate this Agreement or suspend advances to Dealer:
   a) Upon an Event of Default as defined in Section 8; or
   b) If Lender in its judgment believes that further advances to Dealer are not justified due to changes in Dealer's financial condition or other changes in Dealer's business or prospects; provided, however, that in the event of termination of this Agreement on such basis, Lender shall provide Dealer with ninety (90) days prior written notice of termination, which the parties agree shall constitute a reasonable notice period and a reasonable period to enable Dealer to secure financing from another source. At any time on or after the effective date of termination, Lender may, in its discretion, accelerate the entire indebtedness due from Dealer and Dealer promises to pay such amounts upon demand. Any such termination or suspension of advances shall not alter or affect the rights and obligation of the parties with regard to any indebtedness incurred prior to the effective date of any such termination or suspension.

5) **COLLATERAL**
   For the purpose of securing the indebtedness of Dealer under this Agreement, or any other indebtedness of Dealer to Lender, now existing or hereafter arising, Dealer herby grants Lender a security interest in the following described now owned or hereafter acquired property of Dealer ("Collateral"):
   a) All inventory of new and used motor vehicles and other personal property held for sale or lease including, but not limited to, display or demonstration items, returns and repossessions, and all accessories and additions or accessions thereto;
   b) All accounts or rights to payment of money including, but not limited to, accounts receivable from any manufacturer or distributor, and any dealer participation or other account maintained by Lender in the name of Dealer;
   c) All chattel paper, contract rights and general intangibles;
   d) All office furniture, shop equipment, computer equipment and records, tools, lease improvements and fixtures, and other personal property; and
   e) All cash and non-cash proceeds of all of the foregoing including, but not limited to, insurance proceeds, vehicles taken on trade, chattel paper, accounts or assignments of accounts.

   The word "indebtedness" includes any and all now existing or hereafter existing advances, obligations to advance, debts, obligations or liabilities of Dealer to Lender, whether direct or Indirect, contingent or absolute, liquidated or unliquidated, voluntary or involuntary or whether Dealer may be liable individually or jointly with others.

   Dealer Agrees to execute such supplemental documents or financing statements as Lender may require to evidence or perfect the security interest granted herein. Lender may, in its discretion, obtain or require Dealer to deliver to Lender any manufacturer's certificate of origin, certificate of title or other document of title for each Vehicle and Lender may retain such document in its possession until such Vehicle is sold by Dealer and Dealer's indebtedness related thereto is paid. The security interest granted by Dealer to Lender shall be a first and prior security interest.

6) **USE AND PROTECTION OF COLLATERAL**
   Dealer may exhibit and sell Collateral only in the ordinary course of business and shall protect and secure the Collateral. Dealer will keep the Collateral free of taxes, liens or encumbrances, and any amounts which may be paid by Lender, in its discretion, in release or discharge thereof shall be paid by Dealer to Lender upon demand and shall be part of the indebtedness secured under this Agreement. Collateral shall not be used illegally or improperly. Lender shall have the right at any time to inspect the Collateral and Dealer's books and records related thereto. Dealer will not move the Collateral from the dealership premises without the prior written consent of Lender. Dealer may not use any Vehicle for demonstration purposes without prior consent of Lender and execution of a Demonstrator Addendum.

7) **INSURANCE**
   Dealer, at its expense, shall keep the Collateral insured against all risks in such amounts and with such insurance carriers as are acceptable to Lender. All such insurance policies shall designate Lender as loss payee, and shall not be cancelable except upon thirty (30) days prior written notice to Lender. In the event Dealer fails, promptly upon demand by Lender, to provide satisfactory evidence of insurance required hereunder, Lender may, in its discretion, obtain such insurance and pay any premiums and charges therefore, and any such amounts paid by Lender shall be paid by Dealer to Lender upon demand and shall be part of the indebtedness secured under this Agreement.

8) **EVENT OF DEFAULT**
   An Event of Default shall include the following:
   a) A default by Dealer in the payment of any indebtedness or performance of any obligation under this Agreement or any other agreement between Lender and Dealer;
   b) The institution of a proceeding in bankruptcy, receivership or insolvency by or against Dealer or its property;
   c) An assignment by Dealer for the benefit of creditors;
   d) The failure of Dealer to maintain, in good standing, any franchise, license, permit or other agreement necessary for the proper and/or full operation of Dealer's business;
   e) A statement or representation made by Dealer for the purpose of obtaining credit from Lender is determined to be false;
   f) The Collateral becomes in danger of loss, misuse, seizure or confiscation;
   g) The revocation of any guaranty of the indebtedness of Dealer absent consent by Lender, or the occurrence of any event or circumstances which, in the judgment of Lender, materially and adversely affects the ability of any such guarantor to honor such guaranty or;
   h) The occurrence of any event, or material adverse change in the financial condition or business operations of Dealer, such as to cause Lender, in its judgment, to believe the ability of Dealer to repay its indebtedness or honor its obligations to Lender has been substantially impaired.

9) **RIGHTS AND REMEDIES UPON DEFAULT**
   Upon the occurrence of an Event of Default, Lender may, in its discretion, accelerate the entire indebtedness due from Dealer and may take immediate possession of the Collateral without demand or further notice and without legal process. Lender may, in its discretion, require Dealer to remit to Lender all proceeds of sale of each item of Collateral immediately upon receipt thereof by Dealer. Dealer authorizes Lender to contact any account debtor of Dealer in order to verify the amount and status of any such debt and to arrange direct payment thereof to Lender. Dealer further authorizes Lender to contact any third party having possession of Collateral to arrange return thereof directly to Lender. Dealer shall, if so requested by Lender, assemble the Collateral and make it available to Lender at such location as Lender may designate. Lender shall have the right and Dealer hereby authorizes Lender to enter upon the premises wherever Collateral may be and remove same or to store same at such location, without any obligation for rent or other reimbursement to Dealer or Dealer's landlord, pending sale or other disposition thereof. Dealer shall pay all expenses and reimburse Lender for any expenditures, including reasonable attorney's fees and legal expenses, in connection with Lender's exercise of any of its rights and remedies under this Agreement or the enforcement of any provision hereof. Upon an Event of Default, in addition to the rights specified herein, all rights and remedies afforded Lender under this Agreement and under applicable law shall be available. In the event that the application of proceeds from the disposition of Collateral to the indebtedness of Dealer results in a deficiency, such deficiency shall bear interest at the rate specified in this Agreement and shall be paid by Dealer upon demand by Lender.

   Finally, Dealer agrees that the sale by Lender of any Collateral, repossessed by Lender, to the manufacturer, distributor or seller thereof, or to any person designated by such manufacturer, distributor or seller, at the invoice cost to Dealer, less any credits or other discounts granted to Dealer with respect thereto, and less reasonable costs, including but not limited to the costs of transportation and reconditioning, shall be deemed to be a commercially reasonable means of disposing of the same. Dealer further agrees that the return by Lender of any Collateral, repossessed by Lender, to the manufacturer, distributor or seller thereof, in accordance with any repurchase or other agreement between Dealer or Lender and such manufacturer, distributor or seller shall also be deemed to be commercially reasonable means of disposing of the same. Notwithstanding the foregoing, it is expressly understood that such means of disposal shall not be exclusive, and that Lender shall have the right to dispose of any Collateral repossessed hereunder by any commercially reasonable means.

10) **JURY WAIVER**
    Lender and Dealer agree that, in the event of litigation between the parties regarding the performance or enforcement of this Agreement, or in any other manner related to this Agreement, the parties, for their mutual benefit and intending to reduce litigation expenses, hereby waive any right to trial by jury.

**11) SUCCESSORS AND ASSIGNS**
This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties. Notwithstanding the foregoing, Dealer has no right of assignment absent prior written consent of Lender.

**12) ENTIRE AGREEMENT**
Except as otherwise provided or referred to herein, there are no other agreements or understandings, either oral or in writing, between the parties affecting this Agreement or relating to any of the subject matters covered by this Agreement. This Agreement cancels and supersedes all previous agreements between the parties that relate to any matters covered herein provided, however, that no debts, rights or obligations previously incurred by either party shall be affected. This Agreement may be amended only by a writing signed by both parties.

**13) MISCELLANEOUS**
No waiver of any rights of Lender shall be valid unless contained in a writing signed by it. Any delay on the part of Lender in the exercise of any right or remedy shall not operate as a waiver thereof.

Dealer acknowledges that it has furnished Lender with certain financial or business information in order to induce Lender to enter into this Agreement and upon which Lender has relied in doing so, and Dealer hereby certifies that all such information is complete and accurate in all respects. Dealer shall furnish Lender promptly upon request any additional financial or business information in such form and with such frequency as may be required by Lender. Dealer authorizes Lender to make such inquiries of third parties concerning the financial condition or business operations of Dealer as Lender may deem necessary. Dealer further specifically agrees and authorizes Lender to inspect, examine, and secure from Hyundai Motor America, or any of its affiliated companies, (hereinafter collectively referred to as "Hyundai"), at any time copies of all financial statements and other financial data, and all other statements, reports, records, and other information that Dealer has furnished previously, or may hereafter furnish, to Hyundai, or that Hyundai may have prepared or obtained, or may hereafter prepare or obtain, in connection with any audit or review by it of the Dealer's business, and Hyundai may consider Dealer's execution of this Agreement as its authority to release the foregoing to Lender. Dealer further authorizes Lender to furnish Hyundai at any time copies of all financial statements and other financial data, and all other statements, reports, records and other information (i) that Dealer previously has furnished, or may hereafter furnish, to Lender, or (ii) that Lender may have prepared or obtained, or may hereafter prepare or obtain, in connection with any audit or review of Dealer's business by Lender.

**14) SAVINGS CLAUSE**
It is the intention of the parties that this agreement be construed and interpreted in such a manner so as to be valid under applicable law. Any provision of this Agreement prohibited by law shall be ineffective to the extent of such prohibition without invalidating the remaining provisions hereof.

**15) CHOICE OF LAW**
This Agreement shall be governed in accordance with the laws of the state in which Dealer is located as indicated herein.

**16) COVENANTS**
a) Dealer shall maintain a Current Ratio of not less than 1.20:1. Current Ratio is computed by dividing the total dollar amount of current assets (including any last in first out "LIFO" adjustments) less any intangible assets by the total dollar amount of current liabilities. In the event the Current Ratio falls below 1.20:1 for more than two (2) successive calendar months, Dealer will cure such exception(s) within thirty (30) days.

b) Dealer must maintain a Tangible Net Worth Ratio (as defined below) not to exceed 6.0:1. "Tangible Net Worth Ratio" shall mean Dealer's total liabilities divided by net worth (minus any value for goodwill, trademarks, patents, copyrights, organizational expense and other similar intangible assets, plus subordinated debt, plus sixty percent (60%) of any LIFO adjustments). In the event the Tangible Net Worth Ratio exceeds the requirement for more than two (2) successive calendar months, Dealer will cure such exception(s) within thirty (30) days.

Executed on this 27th day of July, 2005.

| INCREDIBLE AUTO SALES, LLC. | HYUNDAI MOTOR FINANCE COMPANY |
|---|---|
| By: _____ | By: _____ |
| R. Nick Gutierrez | Brian P. Fallon |
| Managing Member | National Manager, Commercial Credit |

4